## Murrell, et al. v. Murrell, et al.

(Decided June 6, 1922.)

### Appeal from Hardin Circuit Court.

Deeds—Fraud—Undue Influence—Finding of Chancellor—Sufficiency of Evidence.—In a suit by a father and mother to cancel a deed to their son on the ground of fraud and undue influence, evidence held sufficient to sustain the chancellor's finding in favor of the plaintiffs.

HAYNES CARTER for appellants.

GEORGE HOLBERT for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Mandy Murrell, a colored woman, owned a house and lot in Sonora worth about $400.00, which she had inherited from her daughter. On April 5, 1916, she and her husband, Harrison Murrell, "in consideration of the sum of one dollar cash in hand paid and her love and affection for him," conveyed the property to their son, Sam Murrell. On May 10, 1920, they brought suit against Sam Murrell and his wife, Ethel Murrell, to set aside the deed on the ground of fraud and undue influence. The chancellor awarded them the relief prayed for and the defendants appeal.

When the deed was made Harrison Murrell was about 75 years of age, and Mandy, who had been an invalid for a long time, was a few years younger. Neither could read or write. While Harrison owned some real estate and received a pension from the United States government, the only property which Mandy owned was the house in question. So far as known, Sam Murrell, who owned a farm of 35 acres and had considerable business capacity, was their only living child, though it appears that they had a daughter who went away many years ago and had not been heard from. However, Mandy had a

son, Charles Duvall, by a former husband. After the deed was made, Mandy and Harrison continued to occupy the house and keep up the improvements and pay the taxes. Some time later, Sam, his wife and children moved into the house and friction arose between them and the old people. According to Mandy's evidence she did not sign any deed, "it was a bond calling for a lifetime deed." She did not know it was a deed until some time after that. She did not hardly know what she was doing. She thought she was signing it for a lifetime home. She told Sam not to do his daddy like Mrs. Ligon did hers, throw him out of doors. When Emmett Gentry came to her house, he said, "I brought you this piece of writing to you, for you to sign. Touch the pen." She said, "Can't Harrison touch it?" He said, "If he wants to." She touched the pen and Harrison touched it. She did not ask him or anybody to write a deed that would give the property to Sam Murrell. All the time she wanted her son, Charley Duvall, to have his part of the property. The deed was not read to her by Mr. Gentry at the time she touched the pen. Ever since they had the property Sam had been trying to get them to make a deed or some kind of paper about the property. She told Sam that she would give a bond. He said that if she would make the bond in order to keep his pa from taking those Handley girls in if she dropped off first, he could turn the bond into a deed. The Handley girls were pretty fast women. Sam had talked to her on numerous occasions about Sarah Martha and her husband and had told her several things. He said that he had seen them out in the woods once. She was nearly worried to death by the things Sam told her about Harrison. Afterwards she made an investigation and found that there was nothing in it. If she had known the paper was actually a deed conveying the property to Sam Murrell, she would not have signed it. She had never told Sallie Green, her granddaughter that she had made a deed to keep Harrison and the Handley girls from having the property. On one occasion she saw Harrison and one of the Handley girls lying on the bed in the room while she was sick. On cross-examination she stated that she did not know what a bond was. Sam called it a bond. He said that she was making a bond for a lifetime home to her and Harrison. She and Sam went to the bank. She never had any conversation with Mr. Gentry. She was jealous of Sarah Martha Handley and did not like the way she was doing.

She read the riot act to Harrison and "raised right smart Cain." Sarah Martha was a fine looking girl and Harrison said that he liked her looks pretty well. She told Sam that she was not going to stand for it. When Harrison and Sam's wife had the fight, Harrison said that if she did not get the property back, he was going to leave. She told him that she would get it if she could. She had never talked to Mr. Gooch about it and had not told him that she wanted to fix it up so Harrison could not have the property. Harrison Murrell testified that he was 78 years old. He did not know what was in the deed. If he had known, he would not have signed it. The deed was not read to him. He did know what he was signing. The old lady asked him if he would touch the pen. He did not know it was a deed until about a month later. Time after time Sam had tried to get him to deed his property to Sam. He even got Bill Routt to come to him. Once he brought the papers to Mr. Gooch for him to sign. Gooch told him that he could not make a deed then as he was not dead. The paper that Sam brought him to sign was at the bank then. When Sam asked him to sign the deed, he said he ought to have the property. He had heard Sam talk to Mandy a time or two about the property. Sam said that he ought to have it all, his and hers too. He paid the taxes on the property ever since it had been there and put certain improvements on the property. There was never any misconduct between him and any of the Handley girls. On cross-examination he stated that the girl's name he was "mashed on" was Sarah Martha and she was a good looker. He looked at all girls so far as that was concerned. He had had trouble with his wife about a dozen times. The only girl his wife made objections to was Sarah Martha. After he learned that his wife had made a deed to the property, he told her that she had done something that she had no business doing. Dr. D. E. McClure testified that Mandy and Harrison were very old people. Between August 20, 1915, and November 22, 1916, he treated Mandy for chronic ulcers of the leg, and she was in a very feeble condition. Dr. J. W. Shacklette testified that in his opinion Harrison was about 85 years of age. He treated Mandy for about ten years. During that time she suffered from asthma, nephritis and varicose veins. These ailments were all of a painful nature. Except at short intervals, however, she was able to get around.

The evidence for Sam Murrell was in substance as follows: R. T. Gentry, a banker, testified that Mandy and Harrison talked to him about the making of the deed, and he thought Sam was present. Mandy said that she wanted to deed him the property. He wrote the deed the way Mandy said. Prior to that time he believed that Sam had talked to him about fixing up a deed from Harrison and the old woman to him. At the time Mandy told him about the deed, it occurred to him that she was transferring the property without very much tangible consideration. He had known Harrison and Mandy for a long time and they were both very old and childish. Emmett Gentry testified that he took the acknowledgment of Mandy and Harrison to the deed. He did not remember whether he read the deed to them or not, but it was his custom to read all instruments before taking acknowledgments. He did not remember who came to him to take the acknowledgment, but Sam had talked to him about wanting the deed. W. T. Gooch, a Baptist preacher, testified that before the deed was made Mandy talked with him about the way Harrison was treating her. She said that Harrison was taking care of some other women, and she wanted to fix her place so that if she died, Harrison could not get it. She asked him how she could manage it and he told her she would have to make Sam a deed to it. She then said she would do it. During the conversation she mentioned the Handley girls, and particularly Sarah Martha. She told him that if he saw Sam, to tell him to come up there. He never saw Sam, but afterwards saw Mandy and she said, "Thank God, I have this fixed like I wanted it." He was closely associated with the parties at the time, and they consulted with him about matters. She seemed to have lots of confidence in him, but if she did not want to do anything, you could not get her to do it. In his opinion, both Mandy and Harrison had strong minds and were not childish. They had given Mandy out to die three or four times. For ten years she had been up and down and was a little feeble. Sam Murrell testified that he never made any effort to get Mandy Murrell or Harrison Murrell to deed him the property. The first he knew of it was when Mr. Gooch came to him and told him that Mandy wanted to see him about it. That was only a day or two before the deed was made. When he went to see his mother, she told him that she was going to deed him the property. She said that she wanted to fix it so that Harrison could not put her out

and she did not want him and those girls in there if she died. She mentioned Sarah Martha particularly. She said that she had seen Harrison in bed with Sarah Martha. She never said anything about making a bond to him, but said she wanted to make a deed. He told her that if she was going to deed the property to him, of course he would receive it. After the deed was made, his mother talked all along about it. He never heard her claim that it was a bond until the suit came up. He had talked to Harrison about it, and he never made any claim that it was a bond. When the money was spent by Harrison for repairs he lived in the house and they were not paying him any rent. His mother had told him that his father had brought the Handley girl there several times, and when she said that, he just laughed a little. He never said anything to his mother about his father and Sarah Martha or any other girl. His mother only mentioned it to him one time. His mother only spoke to him once about the deed before it was made. He went with his father and mother to Mr. Gentry's because his mother told him to go. When they went to Mr. Gentry, he did not say anything. His mother told Mr. Gentry how to write the deed. Ethel Murrell, Sam's wife, testified in reference to the trouble occurring after they moved into the house. Sallie Green, Mandy's granddaughter, testified that she saw improper conduct between Harrison Murrell and one of the Handley girls. Before the deed was made, her grandmother told her that she was going to deed the property to Sam on account of Harrison's running through with it when she died and Sam Murrell would have trouble getting it if she didn't. After the trouble arose between Harrison and Sam's wife, Harrison told Mandy to say that she did not deed the land, and she could get it back, and that if she did not do that, he was going to leave her. Her grandmother's health was good at the time she conveyed the property. Her grandmother told her that she had gone down and gotten Mr. Gentry to change the deed. Emmett Gentry brought it up to them and read it to them. She signed the deed and asked if it was necessary for Harrison to sign it. Gentry said that he could if he wanted to, so Harrison signed it. On cross-examination she said that she heard her grandmother say that she would deed the property to Sam to keep the Handley girls from getting it. The Handley girls were 16 or 18, or along there. Harrison Murrell said that he was 85. She was not there when the deed was made and did not know anything about it until 1920.

Appellant insists that no fraud nor undue influence was shown, but that the case, as made out by the evidence, is one where his father and mother in executing the deed followed their own inclinations and did exactly what they intended to do, but finding the result unsatisfactory, determined to make an effort to have the deed set aside. While there are some circumstances tending to uphold this position, there are counterbalancing facts of a very persuasive character, which cannot be overlooked. Appellant was young and active and had had considerable business experience. He owned a farm of 35 acres which was a good estate for one of his station in life. Mandy and Harrison were both old, ignorant and childish, and in addition to this, Mandy was in such feeble health, that she was not expected to live long. The property in question was all the property that Mandy owned, and she had another son who had equal claims on her bounty. Mandy was greatly wrought up by her husband's attention to Sarah Martha and was very jealous of her. While appellant says that he never made any statement to his mother about his father and Sarah Martha, and that his mother only mentioned the matter to him once, she says that he talked about it on numerous occasions, and that she was nearly worried to death by the things which he told her about Harrison. Though appellant says that he never talked to his mother about the deed until after he had a conversation with Gooch, Gooch says that before he saw appellant, Mandy told him that she had fixed the matter up.

In view of these facts, it is difficult to believe that appellant merely acquiesced in the suggestion of his mother, and did not play on her well known jealousy for the purpose of influencing her to enter into an arrangement whereby her husband would be deprived of all control over the property. Not only so, but appellant represented the instrument as a bond, and it is apparent that both Mandy and Harrison were induced to believe that they were not parting with their life interest in the property. This view of the matter is confirmed by the fact that after the conveyance was made, they continued to occupy, improve and pay the taxes on the property. Moreover, both Mandy and Harrison say that the deed was not read to them and the notary does not remember whether he read it or not, though it was his custom in taking acknowledgments to read the conveyance to the parties. Considering the case in the light of the relation

of the parties, the peculiar circumstances under which the deed was executed, the numerous facts tending to show fraud and undue influence and the unsatisfactory explanation given by appellant, we are not prepared to say that the evidence is not sufficient to sustain the finding of the chancellor.

Judgment affirmed.